**Kevin FINCK, Plaintiff and Appellant,**

**v.**

**CITY OF TEA, a Municipal Corporation; Harry Reshetar, individually and as Mayor of the City of Tea; Don Gerdes, Police Commissioner and City Councilman; Henry Hagemeyer, City Councilman; Myron Roth, City Councilman; and Delayne Parlet, City Councilman, Defendants and Appellees.**

**Nos. 16350, 16353.**

Supreme Court of South Dakota.

Argued March 21, 1989.

Decided June 28, 1989.

James A. Eirinberg of Carlsen, Carter, Hoy & Eirinberg, Sioux Falls, for plaintiff and appellant.

Michael J. Schaffer and Susan Jansa Brunick of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for defendants and appellees.

MILLER, Justice.

In this opinion we uphold the termination of a municipal chief of police and hold (1) that the mayor had the statutory power to terminate the chief of police; (2) that it is mandatory to serve a notice upon a public entity before a tort claim may be filed against it; and (3) that a statement made concerning the chief of police by a councilman was not slanderous as a matter of law.

## PROCEDURAL HISTORY

Kevin Finck (Finck) was fired as police chief for the City of Tea (City) and thereafter brought an action against City and its mayor and councilmen alleging wrongful termination, breach of contract, retaliatory discharge, negligent wrongful termination and intentional infliction of emotional distress. Finck's complaint also contains a count alleging defamation, which appears to be exclusively directed against Councilman Henry Hagemeyer.

Defendants (appellees) moved for summary judgment. The trial court granted summary judgment holding (1) that there was no contractual relationship between the parties; (2) that because South Dakota is an employment-at-will state, appellees were entitled to judgment as a matter of law on the wrongful termination, breach of contract, intentional infliction of emotional distress, and negligent wrongful termination counts; (3) that Finck had not established a genuine issue of material fact on the retaliatory discharge count; and (4) that the statements attributed to Councilman Hagemeyer were an opinion and not slanderous as a matter of law.

The trial court denied part of appellees' motion for summary judgment on the grounds that Finck's claim against City is barred due to failure to give the notice required by SDCL 3–21–2 and 3 *and* that SDCL 9–14–13 gives the mayor the absolute power to fire the chief of police.

In this appeal, Finck argues that the trial court inappropriately granted summary judgment, generally challenging all of the rulings made thereon by the trial court. By notice of review, appellees assert that

the trial court erred in denying that part of the motion for summary judgment relating to the statutory notice requirements and the statutory authority of the mayor to fire appointed city officials.

Other than the defamation issue, we need not address the issues raised by Finck because, unlike the trial court, we conclude that SDCL 9–14–13 is dispositive as to the validity of the termination. Thus, we hold for appellees on the notice of review and affirm the *result* but not the specific holding of the trial court. We agree with and affirm the trial court concerning its defamation holding and that part of its denial of the summary judgment relating to mandatory notice, except as the same relates to tort claims.

## FACTS

Because of the limited nature of our holding, a short recitation of the facts is sufficient. Finck was hired as City's chief of police in 1984. There was no formal contract of employment. The city council met in executive session on August 4, 1986, and concluded that his employment should be terminated. On August 6, the mayor, in the presence of Councilman Gerdes, met with Finck and advised him that his employment was terminated for several reasons (Finck was given an opportunity to resign but declined). A written list of those reasons was subsequently furnished by the mayor to Finck's counsel.[1] Finck ultimately commenced this action.

## DECISION

### I

**A MAYOR IN AN ALDERMANIC FORM OF CITY GOVERNMENT HAS THE STATUTORY POWER TO TERMINATE APPOINTIVE CITY OFFICERS.**

■ First, it must be observed that in an aldermanic form of government the mayor is the city's chief executive officer. SDCL

9–8–1. His powers and duties are generally specified in SDCL 9–8–3, and although they do not specifically mention hiring and firing of employees, it does state that the mayor "shall perform such other duties as may be prescribed by the laws and ordinances[.]"

SDCL 9–14–13 states:

In an aldermanic-governed city the mayor shall have power except as otherwise provided to remove from office any officer appointed by him, whenever he shall be of the opinion that the interests of the city demand such removal, but he shall report the reasons for his removal to the council at its next regular meeting.

This court has previously held that this statute gives the mayor "full and absolute power to remove appointed officers whenever, in his opinion, the interests of the city require it[.]" *State ex rel. Dickson v. Williams*, 6 S.D. 119, 125, 60 N.W. 410, 412 (1894). *See also Kierstead v. City of Rapid City*, 248 N.W.2d 363 (S.D.1976) and *Baker v. Jackson*, 372 N.W.2d 142 (S.D. 1985) (*holding abrogated on other grounds* by 1986 S.L. Ch. 73, § 1, *codified at* SDCL 7–18A–15.1, 9–20–18, and 9–20–19.) We continue to believe that the statute gives great power to the mayor although that power may not be absolute. We can envision scenarios where the mayor could abuse his statutory authority, but find no such abuse here.

We note that it is within the exclusive province of the legislature to determine terms under which employment may be terminated. As we have so often noted, the legislature by SDCL 60–4–4 has created "employment at will" in this state. *Breen v. Dakota Gear & Joint Co., Inc.*, 433 N.W.2d 221 (S.D.1988); *Blote v. First Federal Savings & Loan Ass'n of Rapid City*, 422 N.W.2d 834 (S.D.1988); *Bauer v. American Freight System, Inc.*, 422 N.W.2d 435 (S.D.1988); *Hopes v. Black Hills Power & Light Co.*, 386 N.W.2d 490

---

1. The list included:
 (1) Using the city police car for personal reasons;
 (2) Use of profane language;
 (3) Failure to keep accurate police logs;
 (4) Failure to wear his uniform while on duty;
 (5) Failure to keep his police radio on when outside of the vehicle while on duty; and
 (6) Failure to follow the instructions of the city council.

(S.D.1986). The legislature has not seen fit to depart from that status. Similarly, despite our prior pronouncements, they have not seen fit (except as is noted below) to limit the power of a mayor to terminate appointive officers.

We hasten to emphasize and point out that this holding applies only to "appointive officers" as that term is defined by SDCL 9–14–1. Under that statute, appointive officers include the auditor, treasurer (or combined position of finance officer), attorney, engineer, chief of police, and "such other officers as needed and provided for by ordinance."

It is interesting to note that prior to a 1985 amendment, the definition of appointive officers under SDCL 9–14–1 included "policeman," but it is now limited to the chief of police. It is thus clear that the legislature only intended to give the mayor power to terminate the appointive officers, *i.e.,* the department heads, rather than giving him blanket termination authority over *all* municipal employees.

## II

**STATUTORY NOTICE TO A PUBLIC ENTITY IS MANDATORY BEFORE A TORT CLAIM MAY BE FILED AGAINST IT.**

 City asserts that the trial court erred in refusing to grant summary judgment[2] in its favor due to Finck's failure to provide notice in accordance with SDCL 3–21–2 and 3–21–3.

SDCL 3–21–2 provides:

> No action for the recovery of damages for personal injury, property damage, error or omission or death caused by a public entity or its employees may be maintained against the public entity or its employees unless written notice of the time, place and cause of the injury is given to the public entity as provided by

this chapter within one hundred eighty days after the injury.

SDCL 3–21–3, in salient part, reads:

> Notice shall be given to the attorney general and the following officers as applicable:
>
> . . . .
>
> (3) In the case of a municipality, to the mayor or city finance officer[.]

Clearly, Finck's causes of action dealing with intentional infliction of emotional distress and retaliatory discharge sound in tort.[3] In order to commence suit on those counts, the provision of statutory notice was mandatory. It would not be necessary, however, to give the notice on his contract-based claims. However, because we have previously held that the mayor had authority to terminate Finck, we need not reverse the trial court on this issue.

## III

**STATEMENTS MADE BY COUNCILMAN HAGEMEYER WERE NOT SLANDEROUS AS A MATTER OF LAW.**

 Finck alleged, and it appears to be undisputed, that Councilman Hagemeyer at various times called Finck names and insulted him by using words or characterizing him as a "dumb son-of-a-bitch" and "incompetent" in front of the city council and other third persons. He argues that these statements, coupled with his termination, damaged his reputation as a faithful and diligent employee and law enforcement officer.

SDCL 20–11–4 defines slander as a false and unprivileged publication which tends to injure a person with respect to his office, profession, trade or business. The trial court found that Hagemeyer's statements were not slanderous because they were statements of opinion rather than fact.

Epithets such as those used by Hagemeyer are not generally considered to be

---

2. Even though the trial court in orally denying the summary judgment motion on this issue recognized that the statutes apply only to tort-based causes of action, its written Order and Judgment does not so reflect.

3. His cause of action for negligent wrongful discharge also sounds in tort, but is not actionable in this state. *Larson v. Kreisers, Inc.,* 427 N.W.2d 833 (S.D.1988) (Miller, J., concurring specially). *See also Dakota Gear* and *Blote, supra,* and *Tombollo v. Dunn,* 342 N.W.2d 23 (S.D. 1984).

actionable. This result stems from the concept that "there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805 (1974). An opinion is not considered to be a statement of fact and therefore cannot be false. Moreover, even if an opinion is falsely or insincerely held, it may still be constitutionally protected. *See Rinaldi v. Holt, Rinehart & Winston Inc.*, 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299, *cert. denied* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977). As was noted in *Raible v. Newsweek Inc.*, 341 F.Supp. 804, 808–809 (W.D.Pa.1972), "Americans have been hurling epithets at each other for generations.... Certainly such name calling, either express or implied, does not always give rise to an action for libel."

We find, as a matter of law, that Councilman Hagemeyer's statements constitute an opinion and therefore the trial court was correct in granting summary judgment. *See Lewis v. Time Inc.*, 710 F.2d 549 (9th Cir.1983).

For all of the foregoing reasons, summary judgment is affirmed.

WUEST, C.J., and MORGAN, J., concur.

HENDERSON, J., specially concurs.

SABERS, J., concurs in part and dissents in part.

HENDERSON, Justice (specially concurring).

Although I come under the conceptual umbrella of the majority opinion, and therefore concur, I step out to note the rain which fell upon *Baker v. Jackson*, 372 N.W.2d 142 (S.D.1985). Rain is ordinarily refreshing. Abrogation of our ruling in *Baker*, as noted in the majority opinion, was acid rain.[1] A Legislature must stay within its own separate branch of government. The Legislature cannot interpret the constitution. The courts in this State have this function. In *Baker*, in its abrogation, the Legislature assumed the power to interpret the State Constitution. Thoughts which are borrowed from this nation's history can lend a certain dignity to the preservation of the respective branches of government. *See,* The Federalist Nos. 47–51 (J. Madison) (on separation of powers). *See, also,* South Dakota Constitution, Article II.[2] James Madison was a principal contributor to the written document known as the United States Constitution. He is often referred to as "the Father of the Constitution". Through his pen, and mind, streams the system of checks and balances, which regulate our Republic.

SDCL 9–20–18 referenced *Baker.* This statute now abrogates a portion of *Baker.* SDCL 9–20–19, which together with SDCL 9–20–18 and 7–18A–15.1 comprised 1986 S.D.Sess. Laws Ch. 73 (H.B. 1154), contains the following phraseology:

Any legislative decision of a governing body is subject to the referendum process. A legislative decision is one that enacts a permanent law or lays down a rule of conduct or course of policy for the guidance of citizens or their officers. Any matter of a permanent or general character is a legislative decision.

No administrative decision of a governing body is subject to the referendum process.... Hiring, disciplining and setting the salaries of employees are administrative decisions.

---

1. *See State v. Myers*, 411 N.W.2d 402, 405 n. 2 (S.D.1987) (Henderson, J., specially concurring), for dissertation on South Dakota State Legislature creating a subcommittee on judicial opinion. Therein, I warned of a peril to the legitimate function of the tripartite system of government. By "abrogating" decisions of this Court is the State Legislature "abrogating" the power of this Court to legitimately function as the third branch of government?

2. It states: "Division of the Powers of Government: The powers of government of the state are divided into three distinct departments, the legislative, executive and judicial; and the powers and duties of each are prescribed by this Constitution." The Legislature cannot define its own power and duties. Only the State Constitution can.

These immediate words, expressed in a statute, are written like a judicial opinion. One would believe that they are written by a judicial officer. It sounds like it; it looks like it; it has a judicial ring. Our Legislature clearly stepped out of bounds by venturing into this Court's constitutional power.

In defining what is legislative, can the Legislature redefine itself? How can a Legislature interpret a document (State Constitution) which created it? It should not and cannot, within the framework of constitutional government. As Alexander Hamilton explained:

> If it be said that the legislative body are themselves the constitutional judges of their own powers, and that the construction they put upon them is conclusive upon the other departments, it may be answered, that this cannot be the natural presumption, where it is not to be collected from any particular provisions in the constitution. It is not otherwise to be supposed that the constitution could intend to enable the representatives of the people to substitute their will to that of their constituents. It is far more rational to suppose that the courts were designed to be an intermediate body between the people and the legislature, in order, among other things, to keep the latter within the limits assigned to their authority. The interpretation of the laws is the proper and peculiar province of the courts. A constitution is in fact, and must be, regarded by the judges as a fundamental law. It therefore belongs to them to ascertain its meaning as well as the meaning of any particular act proceeding from the legislative body. If there should happen to be an irreconcilable variance between the two, that which

has the superior obligation and validity ought of course to be preferred; or in other words, the constitution ought to be preferred to the statute, the intention of the people to the intention of their agents.

The Federalist No. 78, at 524–5 (A. Hamilton).[3] The United States Supreme Court is in accord:

> The Constitution sought to divide the delegated powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility. The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted.

*I.N.S. v. Chadha,* 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317, 345 (1983). Whether actions are an exercise of legislative power depends not upon their form but upon "whether they contain matter which is properly to be regarded as legislative in its character and effect". *Chadha,* 462 U.S., at 952, 103 S.Ct., at 2784, 77 L.Ed.2d, at 345. "Legislative" is for the judiciary to define, not the legislative branch.

SABERS, Justice (concurring in part and dissenting in part).

I concur on Issues I and II. As against Henry Hagemeyer, I dissent on Issue III, defamation, and on intentional infliction of emotional distress, which was not discussed in the majority opinion.

As indicated in the majority opinion, Councilman Hagemeyer called Finck names and insulted him by using words or charac-

---

**3.** Eighty-five short essays, written by Alexander Hamilton, James Madison, and John Jay became The Federalist Papers. Federalist Paper No. 78 was written by Hamilton to explain how the institution of judicial review could preserve the United States republic. These papers were published from October 27, 1787 to August 16, 1788, to convince the voters of New York to persuade their legislators to vote for the proposed Federal Constitution. Today, the thought behind Hamilton's essay is as important as when it was written. As Hamilton pointed out,

the judiciary was the "least dangerous" of the three branches. For, he wrote, that the judiciary did not have the sword of the executive, nor the purse of the legislature, and it could only depend upon the persuasive power of its judgment. Thus, my duty is clear: To constantly check on the State Legislature, and to resist as *Chadha* instructs me, to prevent that branch from exceeding "the outer limits of its power". *I.N.S. v. Chadha,* 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317, 345 id.

terizing him as a "dumb son of a bitch" and "incompetent." Some of these statements were made at city council meetings and all were made in the presence of third persons and tended to injure Finck in respect to his office or profession as a police officer.

SDCL 20–11–4 states in pertinent part: Slander is a false and unprivileged publication, other than libel, which:

. . . . .

(3) Tends directly to injure [a person] in respect to his office, profession, trade, or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profit[.]

"The law has always been very tender of the reputation of tradesmen, and therefore words spoken of them in the way of their trade will bear an action that will not be actionable in the case of another person." Prosser & Keeton, *The Law of Torts* § 112 at 790–91 (5th ed.1984) (*quoting Harman v. Delany*, 2 Strange 898, 93 Eng.Rptr. 925 (1731)). *See also Groseth International, Inc. v. Tenneco, Inc.*, 440 N.W.2d 276, 281 (S.D.1989) (Sabers, J., dissenting).

The correct procedure for determining the meaning and defamatory character of a communication is set forth in *Restatement (Second) of Torts* § 614 (1977) which provides:

(1) The court determines
 (a) whether communication is capable of bearing a particular meaning, and
 (b) whether that meaning is defamatory.
(2) The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient.

*Groseth, supra* at 279, 283.* Likewise, in *Bego v. Gordon*, 407 N.W.2d 801, 812 (S.D. 1987), we held concerning defamation: "Whether a tort was committed is a question of fact for the jury." Although the

words "son of a bitch" alone may come within the majority's conclusion of non-actionable opinion rather than fact, when determining whether a statement constitutes opinion or fact the court must "examine the statement in its totality in the context in which it was uttered or published." *Information Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir.1980); *see also Lewis v. Time, Inc.*, 710 F.2d 549, 553 (9th Cir.1983). In the context that these words were spoken (at city council meetings and at a cafe in the presence of third persons), the words "dumb son of a bitch" and "incompetent" ridicule Finck in his business or profession because the public may think there is nothing worse than a "dumb cop." This statement is actionable and not privileged and malice is presumed. *See* SDCL 20–11–4; *Vinson v. Linn–Mar Community Sch. Dist.*, 360 N.W.2d 108 (Iowa 1984); *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252 (Minn.1980). Accordingly, I would reverse the trial court in granting summary judgment on this matter. *Groseth International, Inc. v. Tenneco, Inc.*, 410 N.W.2d 159, 172 (S.D.1987); *Bego, supra*. Contrary to the majority, I see nothing to be gained by permitting an individual in a situation like this to injure a person in his business or office such as this with impunity. I believe that it is a proper question for the jury to determine the extent of damages sustained, if any. *See Blessum v. Howard Cty. Bd. of Supervisors*, 295 N.W.2d 836 (Iowa 1980) (court held that whether county supervisor's disparagement of county engineer constituted slander was proper jury question).

Likewise, whether Hagemeyer's conduct constitutes intentional infliction of emotional distress is a proper question for the jury. *Pickering v. Pickering*, 434 N.W.2d 758 (S.D.1989); *French v. Dell Rapids Community Hospital, Inc.*, 432 N.W.2d 285 (S.D.1988); *Wangen v. Knudson*, 428 N.W.2d 242 (S.D.1988); *Wright v. Coca Cola Bottling Co.*, 414 N.W.2d 608 (S.D. 1987). In *French, supra* at 289, this court concluded that it was proper for the jury to determine whether an employer's treat-

---

* Quotation appears in both majority and dissenting opinion.

ment and discharge of an employee was sufficiently egregious to result in liability. Finck should be granted the same opportunity to take his case to a jury.